[Cite as *State v. Platt*, 2014-Ohio-3450.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | | CASE NO. CA2013-12-116 |
| Plaintiff-Appellee, | : | |
| | | O P I N I O N |
| | : | 8/11/2014 |
| - vs - | | |
| | : | |
| PHILLIP PLATT, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 13CR29347

David P. Fornshell, Warren County Prosecuting Attorney, Michael Greer, 500 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

Madden & Oswall Co., LPA, William F. Oswall, Jr., 810 Sycamore Street, 5th Floor, Cincinnati, Ohio 45202, for defendant-appellant

**M. POWELL, J.**

{¶ 1} Defendant-appellant, Phillip Platt, appeals a decision of the Warren County Court of Common Pleas denying his motion to suppress. For the reasons stated below, we affirm the decision of the trial court.

{¶ 2} Appellant is an inmate at the Lebanon Correctional Institution (LCI) serving a

sentence for murder.[1] On May 6, 2013, two shanks, seven-inch pieces of metal sharpened to a point, were found in appellant's cell. As a result, appellant was charged with an institutional rule violation, possession of or manufacturing a weapon. On May 8, 2013, an administrative hearing was held before a hearing officer. Due to the seriousness of the offense, another hearing was also held on May 13, 2013 before the Rules Infraction Board (RIB). During both hearings, appellant pled guilty to the rules infraction and admitted the shanks were his. Appellant was not given *Miranda* warnings during the hearings.

{¶ 3} A criminal investigation was also conducted regarding appellant's possession of the shanks. On June 11, 2013, an Ohio State Highway Patrol Trooper went to LCI to interview appellant. Before the interview began, appellant again admitted the shanks belonged to him. Thereafter, the Trooper advised him of his *Miranda* rights. Appellant then asked for an attorney and the interview concluded.

{¶ 4} On July 29, 2013, appellant was indicted for possession of a deadly weapon while under detention, in violation of R.C. 2923.131(B). Appellant moved to suppress the statements he made during the administrative hearings and during the interview with the State Trooper on the basis that his constitutional rights were violated because he was not given *Miranda* warnings. A hearing was held on November 7, 2013, regarding the motion to suppress.

{¶ 5} At the suppression hearing, LCI Sergeant Keith Boothe testified that on May 8, 2013, he presided over the administrative hearing regarding appellant's alleged rule violation. Appellant was placed in handcuffs, a "belly band," and ankle restraints and escorted to an office where the hearing was conducted.[2] Boothe explained that appellant had been in

---

1. This court affirmed appellant's conviction in *State v. Platt*, 12th Dist. Butler No. CA2011-08-146, 2012-Ohio-5240.

2. LCI Lieutenant Jacob Elerick testified that a "belly band" is "a belt that is connected to the handcuffs to prevent movements up and down or to the sides."

- 2 -

isolation since November 2012 for an unrelated matter and it is institutional policy for an inmate who is in isolation and temporarily removed from his cell to be restrained in this manner. According to Boothe, an inmate in isolation would be restrained "whether he's going to the shower, recreational or what."

{¶ 6} Boothe testified that the only people present during the hearing were himself and appellant. Once inside the room, Boothe informed appellant of the charge against him and asked him how he wished to plead to the charge. Appellant replied that he would plead "guilty." Boothe then asked appellant "if he wished to make a statement" to which appellant stated that his "cellie knew nothing about the shanks and that [the shanks] were his." Boothe explained that appellant had been charged with rule violations before and had been through the hearing and sanctions process. Appellant was not advised of his *Miranda* rights at any time during the hearing. Boothe also stated that appellant was not free to go back to his cell until he was finished with the hearing. Boothe then referred appellant's violation to the RIB for further proceedings.

{¶ 7} LCI Lieutenant Jacob Elerick also testified at the suppression hearing that on May 13, 2013, a hearing before the RIB was held regarding appellant's rule violation. Elerick was present during the hearing and explained that appellant was called in, asked to identify himself, read his basic institutional rights, and then asked to enter a plea of guilty or not guilty. Along with Elerick, two other RIB members were present. Appellant was not informed of his *Miranda* rights. Appellant pled guilty to the rule infraction. Elerick testified that he asked appellant if he wanted to make a statement to which appellant replied that "both weapons that were found in his cell were in fact his and that his cellmate at the time had no knowledge of the weapons." A recording of the hearing which was admitted into evidence shows, that the entire hearing lasted three minutes.

{¶ 8} Elerick testified that because appellant was in isolation, he was restrained in leg

irons, handcuffs, and a belly band and was escorted to the hearing. Elerick explained appellant could have refused to attend the RIB hearing and that during the hearing appellant was free to leave whenever he wished. However, Elerick testified that he did not inform appellant of these rights. Elercik also stated that appellant had been previously involved in a hearing before the RIB.

{¶ 9} Ohio State Highway Patrol Trooper Chad Smith testified that on June 11, 2013, he interviewed appellant regarding his alleged possession of a weapon while in prison. As appellant remained in isolation, he was escorted to the interview by a correctional officer and was in ankle restraints, handcuffs, and a belly band. The interview was conducted inside the LCI "attorney visit room." Smith and appellant were the only people present in the room, and a small table divided the room where Smith sat on one side and appellant on the other. Once appellant entered the room and sat down, Smith introduced himself and asked appellant if he understood why he was there. Smith explained that he introduced himself because he was not wearing a uniform that identified him as law enforcement and was unsure if he needed to explain the allegations to appellant before the questioning began. Smith stated that appellant replied to his question "as one continuous response, * * * yes, it's for the knives that were found in my cell, and [appellant] continued and went on and said that my cellie didn't know about it, those were mine." Smith then explained appellant's constitutional rights. After hearing these rights, appellant requested an attorney, and Smith terminated the interview.

{¶ 10} At the conclusion of the hearing, the trial court denied appellant's motion to suppress reasoning that *Miranda* warnings were not required because appellant was never interrogated with respect to the rule violations and the interview with Smith was not coercive. Immediately, after the suppression hearing, a trial commenced where appellant was found guilty of possession of a deadly weapon while under detention in violation of R.C.

2929.131(B). Appellant was sentenced to six years in prison consecutive to the sentence he is currently serving for murder.

{¶ 11} Appellant now appeals, asserting a sole assignment of error:

{¶ 12} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT OVERRULED HIS MOTION TO SUPPRESS.

{¶ 13} Appellant argues that the trial court erred in denying his motion to suppress the statements he made on: 1) May 8, 2013, to Boothe; 2) May 13, 2013, to Elerick; and 3) June 11, 2013, to Smith. Appellant maintains that due to his incarceration, the physical restraints, and other factors, he was in custody for purposes of *Miranda*. Appellant also asserts that in each instance he was interrogated. Therefore, because appellant was not given *Miranda* warnings, these statements should have been suppressed.

{¶ 14} Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact. *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 15, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. When considering a motion to suppress, the trial court, as the trier of fact, is in the best position to weigh the evidence in order to resolve factual questions and evaluate witness credibility. *State v. Johnson*, 12th Dist. Butler No. CA2012-11-235, 2013-Ohio-4865, ¶ 14. In turn, when reviewing the denial of a motion to suppress, this court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Durham*, 12th Dist. Warren No. CA2013-03-023, 2013-Ohio-4764, ¶ 14. An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard. *Id.*

{¶ 15} "When a suspect is questioned in a custodial setting, the Fifth Amendment requires that he receive *Miranda* warnings to protect against compelled self-incrimination."

*State v. Johnson*, 12th Dist. Fayette No. CA2013-04-012, 2014-Ohio-1694, ¶ 10, quoting *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, ¶ 34. However, "the duty to advise a suspect of constitutional rights pursuant to *Miranda* * * * arises only when questioning by law enforcement rises to the level of a custodial interrogation." *State v. Vansickle*, 12th Dist. Fayette No. CA2013-03-005, 2014-Ohio-1324, ¶ 53.

{¶ 16} "Custody" is a "term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, ___ U.S. ___, 132 S.Ct. 1181, 1189 (2012). The initial step in determining whether someone is in custody "is to ascertain whether, in light of 'the objective circumstances of the interrogation,' a 'reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id.*, quoting *Stansbury v. California*, 511 U.S. 318, 322-323, 114 S.Ct. 1526 (1994) (per curiam) and *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457 (1995). In determining whether an individual was in custody, the court must examine the totality of the circumstances surrounding the interrogation. *State v. Durham*, 2013-Ohio-4764 at ¶ 17.

{¶ 17} The United States Supreme Court has recently addressed whether a person is in custody for purposes of *Miranda* when that individual is incarcerated. *Howes.* In *Howes*, the court stated that "imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*." *Id.* at 1190. In so holding, the court cautioned that "[n]ot all restraints of freedom of movement amount to custody for purposes of *Miranda*" as the court has "'decline[d] to accord talismanic power' to the freedom-of-movement inquiry." *Id.* At 1189, quoting *Berkemer v. McCarty,* 468 U.S. 420, 437, 104 S.Ct. 3138 (1984). Instead the focus should be "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at 1190.

{¶ 18} In *Howes*, the Supreme Court reviewed the Sixth Circuit's decision which held that an interrogation where an individual is imprisoned, questioned in private, and questioned

about conduct that occurred outside the prison "makes any such interrogation custodial *per se*." *Id.* at 1187. In rejecting the Sixth Circuit's "categorical rule," the court reasoned that questioning an inmate "generally [does not] involve the shock that very often accompanies arrest; a prisoner is unlikely to be lured into speaking by a longing for prompt release; and a prisoner knows that his questioners probably lack authority to affect the duration of the sentence." *Id.* at paragraph two of the syllabus. Additionally, the fact that a prisoner is taken aside for questioning "does not necessarily convert a noncustodial situation into *Miranda* custody" because "questioning a prisoner in private does not generally remove him from a supportive atmosphere and may be in his best interest." *Id.* Lastly, whether the questions relate to events occurring within or outside of the institution, the setting of those events does not affect "the coercive pressure that *Miranda* guards against." *Id.*

{¶ 19} Ultimately, in *Howes* the court found that the inmate was not in custody when he was questioned in a conference room by two sheriff's deputies about criminal activity he had allegedly engaged in before coming to prison. *Id.* at 1186. The *Howes* court observed that the following facts weighed in favor of custody: 1) the inmate was summoned to the interview; 2) the interview was lengthy, lasting five to seven hours and was conducted late at night; 3) the sheriff's deputies were armed; 4) one of the deputies used a "very sharp tone;" and 5) the inmate was not advised that he was free to decline to speak with the officers. *Id.* at 1192-1193. However, the court further observed that these circumstances were offset by others, including: 1) the inmate was told that he could leave and go back to his cell; 2) the inmate was not physically restrained or threatened; 3) the interview took place in a well-lit, average-sized conference room; 4) the inmate was offered food and water; and 5) the door to the room was sometimes left open. *Id.* at 1193.

{¶ 20} Within the factual context of *Howes*, the court noted that the "most important" factor * * * was that the defendant "was told at the outset of the interrogation, and reminded

thereafter, that he was free to leave and could go back to his cell whenever he wanted." *Id.* at 1193. Additionally, the court noted the fact that the inmate was escorted from his cell and back to his cell by a guard did not amount to custody. *Id.* at 1193. Instead, "[e]scorts and special security precautions may be standard procedures regardless of the purpose for which an inmate is removed from his regular routine and taken to a special location." *Id.* at 1192.

{¶ 21} Considering the totality of the circumstances, we find that appellant was not in custody for purposes of *Miranda* during the administrative hearings conducted on May 8 and May 13, 2013 or during the June 11, 2013 interview. Appellant has failed to show how the administrative hearings and the interview with Trooper Smith presented the same inherently coercive pressures as the type of station house questioning at issue in *Miranda.*

{¶ 22} Unlike *Howes*, where the interview lasted five to seven hours and interrupted the inmate's sleep schedule, the hearings and the interview were of extremely short duration. The May 8th hearing consisted of Boothe informing appellant of the charge against him, taking appellant's guilty plea, and then a brief statement in which appellant claimed possession of the shanks. The same details were discussed in the May 13th hearing and a tape recording admitted into evidence shows that the entire hearing lasted three minutes. The June 11th interview with Smith was exceedingly brief as it only lasted for the duration of Smith asking appellant if he understood why he was there, appellant's statements, and a recitation of appellant's constitutional rights.

{¶ 23} While appellant was escorted to the hearings and interview by a correctional officer and physically restrained, appellant was escorted and restrained in accordance with institutional policy. Appellant would have therefore been escorted and restrained regardless of the purpose of the removal from his cell. *See People v. Cortez*, 299 Mich. App. 679, 699-700 (2013), citing *Howes.* At the time of the hearings and interview, appellant had been in isolation for six months and was certainly accustomed to such restraints. Moreover,

appellant never indicated in any manner that he did not want to talk to law enforcement. Rather, he appeared to volunteer information regarding the shanks and simply wanted to exculpate his cell mate. Further, the recording of the May 13th hearing shows that Elerick did not use a sharp tone of voice and there was no indication that a strong tone of voice was used in the May 8th hearing or the June 11th interview.

{¶ 24} Although Boothe testified that appellant was not free to leave the May 8th hearing and appellant was never informed of his freedom to leave the May 13th hearing, other coercive aspects of the interactions in *Howes* are absent. Both administrative hearings were conducted to merely inform appellant of the charges against him and take his plea. The administrative hearing with Boothe, the RIB hearing and the interview with Smith were all of short duration. The testimony established that appellant was familiar with the procedure regarding institutional rule violations as he had previously violated rules and had appeared before a hearing officer and the RIB. Based upon these factors we do not believe, in a consideration of the totality of the circumstances, that it was of critical importance that appellant was not advised that he was free to leave during any of these sessions, as was the defendant in *Howes*. Accordingly, the environment surrounding the questioning of appellant and the lack of coercive pressure, establish that appellant was not in custody for purposes of *Miranda* during the hearings. *See People v. Elliot*, 494 Mich. 292, 309 (2013).

{¶ 25} Therefore, the trial court did not err in denying appellant's motion to suppress the statements he made on May 8, 2013, May 13, 2013, and June 11, 2013 on the basis that his *Miranda* rights were violated. Appellant was not in custody for purposes of *Miranda* during the May 8 and May 10, 2013 hearings or the June 11, 2013 interview. Because appellant was not in custody, we do not need to determine whether the hearings or the interview constituted an "interrogation."

{¶ 26} Appellant's sole assignment of error is overruled.

{¶ 27} Judgment affirmed.


S. POWELL, P.J., and PIPER, J., concur.